IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | | |
|---|---|---|
| Amalgamated Transit Union and | ) | |
| Amalgamated Transit Union, Local 836, | ) | |
| | ) | |
| Plaintiffs, | ) | No. 15-cv-855 |
| | ) | |
| v. | ) | The Honorable Janet T. Neff |
| | ) | |
| Interurban Transit Partnership d/b/a The Rapid, | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR
MOTION FOR A TEMPORARY RESTRAINING ORDER**

## Introduction

The plaintiffs, Amalgamated Transit Union (ATU or the International Union) and ATU Local 836, ask only to do the same peaceful handbill leafleting that defendant Interurban Transit Partnership (ITP) has always allowed in the open area of Rapid Central Station. In violation of both the First Amendment and the Equal Protection Clause, ITP is denying Plaintiffs' right to speak here only because of the specific pro-union message. It denies a right extended last year to Michigan politicians, citizen groups, and even Local 836. In April, in the same area, ITP itself held a political rally to gain support for a gas tax to fund mass transit. Plaintiffs have both a right of access to this forum—and a right of *equal* access. Under the Supreme Court's "forum" analysis, the outside area is clearly a "traditional" or—in the alternative—a "designated" public forum. *See Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45-46 (1983). It is a *traditional* public forum because it is not an indoor bus terminal but a bus stop. It is functionally equivalent to any other bus stop, on a city sidewalk, along a city street. The buses leave from the outside area and go to other stops, where even ITP allows leafleting to occur. Any ban on speech in a traditional public forum is subject to strict scrutiny.

1

Furthermore, if not a traditional public forum, this outside area is now a *designated* public forum. It is so designated because ITP has consistently allowed speech and leafleting for candidates and their causes. ITP may claim the official policy is otherwise; but in the case of a *designated* public forum, it is the *actual* policy that counts.

Finally, even if this outside area were a *non-public* forum—and it is not—the ban here would still be unconstitutional as it singles out one type of pro-union message, in violation not just of the First Amendment but the Equal Protection Clause.

The United States Court of Appeals for the Sixth Circuit has made clear there is a presumptive First Amendment right of access to the public property of a transit authority, especially where that has occurred in the past. *See United Food and Commercial Workers Union, Local 1099 v. Southwest Ohio Reg. Transit Authority* (hereinafter "*Southwest Ohio*"), 163 F.3d 341 (6th Cir. 1998) (holding that the exterior of a bus is a designated public forum and upholding the right of a labor union to place the ad). However, if it is not a public forum, this Circuit has held that a transit authority may not pick and choose which type of message to allow. *Id.* Likewise, district courts in this Circuit have found bus benches and other areas to be public forums, and not just the streets and sidewalks. *See Bench Billboard Co. v. City of Toledo*, 690 F. Supp. 2d 651 (N.D. Ohio 2010); *Coleman v. Ann Arbor Transp. Auth.*, 904 F. Supp. 2d 670 (E.D. Mich. 2012).

Whether a public forum or not, strict scrutiny of the ITP's ban on just one particular pro-union ad is required here. The ITP must show some compelling state purpose for singling out just this one ad—and it is highly unlikely that any such showing can be made. Plaintiffs are likely to succeed on the merits. Because a First Amendment violation of this type always causes

irreparable injury, Plaintiffs therefore meet the other requirements for preliminary injunctive relief.

## Facts

Pursuant to Rule 65, Fed. R. Civ. P., plaintiffs will present live testimony to establish the facts supporting this motion for a preliminary injunction. The facts as set forth in the complaint—and that testimony will show—are as follows:

*Background*

Local 836 represents the bus drivers and other hourly employees of the Interurban Transit Partnership (ITP), which is popularly known as "The Rapid." Since December 2014, Local 836 and ITP have been bargaining over the terms of a new collective bargaining agreement (CBA), to succeed the old CBA which expired on June 30, 2015. The parties have agreed to extend the terms of the old CBA to August 29, 2015 but have not yet reached agreement. Meanwhile Local 836—with assistance from the International Union—has engaged in informational leafleting of the public. The purpose of the informational leaflet is to educate the public with respect to the negotiations with ITP, which is a governmental agency.

From August 4 through and including August 17, 2015, various ATU and Local 836 representatives distributed leaflets, including the one as Exhibit A hereto to members of the public. The distribution of leaflets has occurred at various locations—including ITP bus stops. Furthermore, in addition to bus stops, Plaintiffs have distributed leaflets at and around ITP's Kenwood Station, which is similar to but smaller in size than Rapid Central Station.

*The setting*

The only difficulty has been ITP's opposition to the distribution of informational literature in the outside area of the Rapid Central Station. Plaintiffs have not sought to distribute within the terminal building itself. Rather, Plaintiffs' representatives—who are union staff or off-

duty employees—have leafleted outside the terminal building and in the large open-air space where passengers get on and off the buses. This area—or bus bay—consists of a sidewalk island platform under a canopy and a roadway that goes around it.

The roadway in this outside area has more than one kind of traffic—not just ITP buses but private bus companies use the area. The roadway itself also connects directly into Grand Rapids city streets, including Bartlett Street, Cherry Street, and Ellsworth Avenue. Unlike the terminal building, the area is similar to a city street and sidewalk. As noted above, it is also similar to the Kentwood Station, which also has a bus bay—albeit a smaller one—and where informational leafleting has continued without objection by ITP.

*ITP's recent bar*

In recent weeks, ITP has introduced a new bar on leafleting by Plaintiffs—only in the outside area of Rapid Central Station. In all leafleting to date, Plaintiffs' representatives have been standing in outdoor spaces accessible to the public and not inside the terminal building. There are no picket signs. There is no strike. At no time have Plaintiffs' representatives been disruptive.

On numerous occasions in the past few weeks, the ITP security staff has told those doing the leafleting that if they continue they will be arrested and that the off duty employees who do this leafleting will be disciplined.

*ITP's past policy*

Historically in the area around Rapid Central Station ITP has allowed informational leafleting by politicians, citizens and even by the plaintiff labor union. Candidates for public office have distributed campaign flyers here. Voter registration has occurred on this site.

4

In 2012 and 2013, plaintiff Local 836 itself distributed informational literature here, to garner public support for mass transit. In 2014, candidates for the U.S. Senate and for Governor made appearances in the outside area of Rapid Central Station. In the U.S. Senate race, both Gary Peters and Michael Scruggs campaigned in this open area. Likewise, in the race for Governor, Mark Schauer campaigned here as well. Even more recently, in 2015, plaintiff Local 836 distributed literature here in support of Proposal 1, a statewide ballot proposal to increase the state sales tax from 6 percent to 7 percent in order to increase funding for mass transit. Furthermore, ITP itself joined Plaintiff Local 836 in conducting this political event. ITP representatives stood on the island under the canopy and distributed literature to passengers urging their political support.

## Argument

**I.    Plaintiffs meet the standards in this Circuit for issuance of a temporary restraining order and preliminary injunction.**

On a motion for a preliminary injunction, a court must consider: "(1) the likelihood that the party seeking the preliminary injunction will succeed on the merits of the claim; (2) whether the party seeking the injunction will suffer irreparable harm without the grant of the extraordinary relief; (3) the probability that granting the injunction will cause substantial harm to others; and (4) whether the public interest is advanced by the issuance of the injunction." *Washington v. Reno*, 35 F.3d 1093, 1099 (6th Cir. 1994) (citing *Keweenaw Bay Indian Community v. Michigan*, 11 F.3d 1341, 1348 (6th Cir. 1993)). However, these "four considerations …are factors to be balanced, not prerequisites that must be met. Accordingly, the degree of likelihood of success required to support a grant of a preliminary injunction may depend on the strength of the other factors considered." *Id.* (quoting *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985). The standards for issuing temporary restraining orders are

identical to the standards for preliminary injunctions. *See Ohio State Univ. v. Thomas*, 738 F. Supp. 2d 743, 748 (S.D. Ohio 2010).

However, as set forth in *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion), "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." For this reason, the Sixth Circuit has held that in cases seeking preliminary injunctive relief in the First Amendment context, "the factors for granting a preliminary injunction essentially collapse into a determination of whether restrictions on First Amendment rights are justified to protect competing constitutional rights." *Platt v. Bd. of Comm'rs on Grievs. & Discipline of the Ohio Supreme Court*, 769 F.3d 447, 453-54 (6th Cir. 2014) (quoting *Elrod* and *Cnty. Sec. Agency v. Ohio Dep't of Commerce*, 296 F.3d 477, 485 (6th Cir. 2002)). Hence, the four factors that the court must normally consider on such a motion are "essentially encompassed by the analysis of the movant's likelihood of success on the merits." (quoting *Am. Freedom Def. Initiative v. Suburban Mobility Auth. for Reg'l Transp.* (hereinafter "*SMART*"), 698 F.3d 885, 890 (6th Cir. 2012)). Because, for the reasons set forth below, plaintiffs have shown they are very likely to succeed on the merits, their request for relief should be granted.

Furthermore, in one respect, the temporary loss of First Amendment freedoms in this case will be permanent. The parties hope to negotiate a new collective bargaining agreement before August 29, 2015. After that agreement is negotiated, Plaintiffs' appeals to the public will be irrelevant.

identical to the standards for preliminary injunctions. *See Ohio State Univ. v. Thomas*, 738 F. Supp. 2d 743, 748 (S.D. Ohio 2010).

However, as set forth in *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion), "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." For this reason, the Sixth Circuit has held that in cases seeking preliminary injunctive relief in the First Amendment context, "the factors for granting a preliminary injunction essentially collapse into a determination of whether restrictions on First Amendment rights are justified to protect competing constitutional rights." *Platt v. Bd. of Comm'rs on Grievs. & Discipline of the Ohio Supreme Court*, 769 F.3d 447, 453-54 (6th Cir. 2014) (quoting *Elrod* and *Cnty. Sec. Agency v. Ohio Dep't of Commerce*, 296 F.3d 477, 485 (6th Cir. 2002)). Hence, the four factors that the court must normally consider on such a motion are "essentially encompassed by the analysis of the movant's likelihood of success on the merits." (quoting *Am. Freedom Def. Initiative v. Suburban Mobility Auth. for Reg'l Transp.* (hereinafter "*SMART*"), 698 F.3d 885, 890 (6th Cir. 2012)). Because, for the reasons set forth below, plaintiffs have shown they are very likely to succeed on the merits, their request for relief should be granted.

Furthermore, in one respect, the temporary loss of First Amendment freedoms in this case will be permanent. The parties hope to negotiate a new collective bargaining agreement before August 29, 2015. After that agreement is negotiated, Plaintiffs' appeals to the public will be irrelevant.

**II.     Plaintiffs are likely to succeed on the merits of their legal claim here—that the ITP's ban unlawfully restricts Plaintiffs rights to speak in a public forum, and that in any event, it is unlawful viewpoint discrimination.**

   **A.     The ban on this one type of hand-billing is unconstitutional on at least three different legal grounds.**

As set forth in the Introduction, Plaintiffs contend that the ITP's bar violates both the First Amendment and the Equal Protection Clause of the Fourteenth Amendment. Specifically, Plaintiffs contend that the outside area of the Rapid Central Station is a public forum—either a "traditional" public forum or a "designated" public forum. Any restriction, whether content-neutral or not, to a traditional or designated public forum is subject to strict scrutiny. *Southwest Ohio*, 163 F.3d at 350 (quoting *Cornelius v. NAACP Legal Def & Educ. Fund*, 473 U.S. 788, 800 (1985)). But Plaintiffs also contend that even if it is not a public forum, ITP can only restrict access on a reasonable and viewpoint-neutral basis. *Id.* In other words, Plaintiffs have a right of access to the forum that is *equal* to that which ITP has given candidates and other civic groups.

The Supreme Court has adopted a forum analysis to determine when citizens have a right to go on to public property and speak, notwithstanding neutral rules that purport to prohibit such speech. *See Cornelius*, 473 U.S. at 800. The reach of First Amendment protection depends on whether the governmental property is a traditional public forum, a designated public forum, or a nonpublic forum. *Id.* (citing *Perry*). As set forth in cases like *Perry,* a "traditional public forum" is a place "which by long tradition or by government fiat ha[s] been devoted to assembly and debate,' such as streets and parks." 460 U.S. at 45. A "designated public forum" is a place which the state has opened "for use by the public as a place for expressive activity." *Id.* Finally, a private or "nonpublic forum" is public property "which is not by tradition or designation a forum for expressive activity." *Id.* But even here, plaintiff has a right of equal access—that is, the

7

government cannot give access to some but not others. *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 96 (1972).

Whether the outside area of Rapid Central Station is a traditional or designated public forum, the ITP policy is subject to strict scrutiny. *Cornelius*, 473 U.S. at 800. That is, it must both serve both a compelling state interest and be narrowly drawn to serve that interest. *Id.* Finally, if the outside area is not a public forum of any kind, the new policy is still unconstitutional—since notwithstanding the official claim, it is a naked case of viewpoint discrimination. *See id.* The actual policy is just to bar one kind of message—an appeal to the public by a labor union to support better wages, hours and working conditions. It hardly need be said that in the current political day, a public appeal for better workplace conditions is core First Amendment speech.

In this case, plaintiff seeks to challenge a content-based exclusion, or really an ad hoc decision to exclude a message of support for the plaintiff local in collective bargaining with ITP. As the Supreme Court has stated:

> But, above all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content….[I]t may not select which issues are worth discussing or debating in public facilities….Selective exclusions from a public forum may not be based on content alone, and may not be justified by reference to content alone.

*Mosley*, 408 U.S. at 96 (barring law to prevent picketing within school building could not make exceptions for certain issues).

The ITP has allowed a wide range of speech and expressive activity—including leafleting—at the Rapid Central Station. It must show—and cannot show—that a ban on a pro-union message "is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *Perry*, 460 U.S. at 45.

**B.     The ban is illegal because the outside area of the Rapid Central Station is a bus stop and therefore a "traditional" public forum.**

Under the Supreme Court's analysis, the Rapid Central Station is or should be deemed a traditional public forum. The area here is outside of the terminal—an open space under a canopy. It is just a very large bus stop. Even if the terminal building is not a public forum, the outside is a different matter—it feeds directly into the public streets of Grand Rapids, and it is like a public street itself. Aside from the ITP buses, there is other traffic from Greyhound and other private bus companies. Pedestrians stand on a concrete island—as they sometimes do at bus stops on city streets. Certainly political candidates and citizen groups treat it as a traditional public forum. By tradition they come here to pitch their causes and meet the voters. The curious feature of the ITP ban is that it applies to just one, and only one bus stop. At other bus stops—which are mostly on city streets—not even ITP denies the right to handbill. It is wise to do so, since bus stops on city streets are traditional public forums. *See Bench Billboard v. City of Toledo* 690 F. Supp. 2d 651, 662-63 (N.D. Ohio 2010).

But the difference between this one bus stop and all the others is trifling—in a certain sense, cosmetic. It is just a very slightly different use of urban space. The area fits the Supreme Court's historic and original definition of a *traditional* public forum:

> Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions. Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens.

*Hague v. Committee for Indus. Org.*, 307 U.S. 496, 515 (1939). In other words, these areas are public forums because the citizens treat them as public forums, regardless of what the government may like. *Frisby v. Schultz*, 487 U.S. 474, 481 (1988) (recognizing that "public

9

streets and sidewalks have been used for public assembly and debate, the hallmarks of a traditional public forum"); *United Church of Christ v. Gateway Econ. Devel. Corp.*, 383 F.3d 449, 452 (6th Cir. 2004) (noting that public sidewalks are "public thoroughfares" and "open to the public for general pedestrian passage"); *Bench Billboard v. City of Toledo*, 690 F.Supp.2d 651, 662 (N.D. Ohio); *Bench Billboard v. City of Cincinnati*, No. 1:07cv589, 2008 U.S. Dist LEXIS 42517, at *17 (S.D. Ohio May 28, 2008) ("In this case, the property is a public sidewalk, also a traditional public forum.") In a sense because they are open spaces—not buildings or terminals—citizens "commandeer" them as public forums.

In *Amalgamated Food Employees Union v. Logan Valley Plaza*, 391 U.S. 308, 319-20 (1968), the Court found that even the open traffic area of a private shopping center could be a public forum. In *Logan Valley*, the Court found that the roadway and sidewalks within the shopping center were similar to the streets and sidewalks of a city. *Id.* Accordingly, where the private owner had opened up the property to the public, that owner had to allow the same speech as in a traditional public forum. While the holding in *Logan Valley* has been limited somewhat, it remains true that when even a *private* enterprise plays the role of the municipality, it can become subject to the limitations of the First Amendment. *See Hudgens v. NLRB*, 424 U.S. 507, 519-20 (1976). Here the roadway and concrete island outside the Rapid Central Station are publicly-owned roads and sidewalks that connect directly to the Grand Rapids city roads and sidewalks.

Furthermore, like a traditional public forum it has been traditionally open to political speech. It is an ideal and traditional place for Michigan candidates to reach voters. In the U.S. Senate election of November 2014, both candidates—Gary Peters and Michael Scruggs—went to Rapid Central Station to greet passengers. These were public events, which no one questions. In addition, the candidate for Governor—Mark Schauer—also campaigned there. They went there

10

instinctively—not from any inside knowledge that it is a "designated" public forum, but because it is so obviously a bus stop, which political campaigns are used to targeting. It is self-evident to everyone—politicians, citizen groups, and others—that this is a public space where they have a right to speak, and that makes it a traditional forum whatever the government may like to think.

### C. If not a traditional public forum, then the Rapid Central Station is a designated public forum.

Rapid Central Station is also, in practice, a place where the ITP has intentionally allowed speech to occur. For the purposes of the First Amendment it matters little whether this outside area is a "traditional" or a "designated" public forum. In either case, any ban on speech is subject to strict scrutiny. The state may exclude speakers from a designated public forum "only when the exclusion is necessary to serve a compelling state interest and the exclusion is narrowly drawn to achieve that interest." *Cornelius*, 473 U.S. at 800; *see Perry*, 460 U.S. at 45. As set out in *Southwest Ohio,* there is a two-part test for a "designated" public forum:

> First, we look to whether the government has made the property generally available to an entire class of speakers or whether individual members of that class must obtain permission in order to access the property. Second, we look to whether the exclusion of certain expressive conduct is properly designed to limit the speech activity occurring in the forum to that which is compatible with the forum's purpose.

163 F.3d at 352. In conducting this analysis, the court looks not just at the official policy, but at the governmental entity's actual practice in allowing or prohibiting speech. *Id.* at 352-53. Plaintiffs easily meets both parts of the test for a "designated" public forum.

In this case, unlike in *Southwest Ohio*, ITP has not required other citizens engaged in political speech to request permission to engaged in that speech at the Rapid Central Station. Nor has ITP required even the Plaintiffs to seek such permission at other indistinguishable bus stops,

like Kentwood Station. ITP has allowed the use of these open areas for all sorts of political speech. ITP itself has engaged in political speech to members of the public there.

In other words, this is not a case where there has been a consistent refusal to allow political messaging, as in *SMART*, 698 F.3d 885 (6th Cir. 2012) (barring an ad from a virulently anti-Islamic group). In that case, the transit authority had a consistent policy, albeit with an occasional lapse. Plaintiffs are not citing a few inadvertent exceptions. When ITP itself is actually sponsoring its own political events, it shows ample intent to allow the use of the area for political speech.

Given this designation of the forum as one for political speech, there is no way that ITP can justify the exclusion of Plaintiffs on the basis of a policy that is "properly designed to limit the speech activity occurring in the forum to that which is compatible with the forum's purpose." As the court stated in *Southwest Ohio*:

> We agree with the UFCW that in accepting a wide range of political and public speech…[the defendant] has demonstrated its intent to designate its advertising space a public forum…Acceptance of political and public issue advertisements, which by their very nature generate conflict, signifies a willingness on the part of the government to open the property to controversial speech, which the [Supreme] Court in *Lehman* recognized as inconsistent with operating the property as a commercial venture.

163 F.3d at 355 (citing *Lehman v. Shaker Heights*, 418 U.S. 298, 303-04 (1974)).

> **D.  ITP's prohibition of political activity by the ATU does not meet the standard of strict scrutiny because it is not necessary to serve any compelling government purpose and not narrowly tailored to such a purpose.**

Because the open area is a public forum, the decision to bar union leafleting or any other restriction on speech is subject to strict scrutiny. "Speakers can be excluded from a public forum only when the exclusion is necessary to serve a compelling state interest *and* the exclusion is narrowly drawn to achieve that interesting. *Cornelius,* 473 U.S. at 811. Here, as in *Southwest*

*Ohio*, it is "self-evident" that excluding a pro-union message does not survive strict scrutiny. As stated in that case:

> Here there is no established causal link between [the government's] goal of enhancing the environment for its riders, enhancing [its] standing in the community, and enabling [it] to attract and maintain its ridership, and its broad-based discretion to exclude advertisements that are too controversial or not aesthetically pleasing. Although political and public-issue speech is often contentious, it does not follow that such speech necessarily will frustrate [the government's] commercial interests. Rather, it may be the case that only in rare circumstances will the controversial nature of such speech sufficiently interfere with the provision of Metro bus services so as to warrant excluding a political or public-issue advertisement.

163 F.3d at 354. The rare circumstances do not exist here—nor has ITP any considered policy or "narrowly tailored" policy on this point, since it is claiming not a fine-tuned but general bar.

        E.    **Even if not a public forum, this ad hoc ban of Plaintiffs is unconstitutional viewpoint discrimination.**

Finally, even if this area were not a public forum—and it certainly is—ITP's ban on this one particular message would be unconstitutional viewpoint discrimination. Indeed, that was the alternative holding in *Southwest Ohio,* the one to which all three members of the panel joined. *Id.* at 355 and 365 (Wellford, J. concurring). Whether the area is a public forum or not, the Plaintiffs at least have a right to *equal* access, not just under the First but Fourteenth Amendment. They have the same right as other political and citizen groups who go there to argue their causes. It is never appropriate for a government to engage in viewpoint discrimination. *See Mosley*, 408 U.S. at 96.

So concluded the Sixth Circuit in its alternative holding in *Southwest Ohio*. While finding the ad space to be a public forum, this Court also stated:

> Even if we were to conclude that the exteriors of the Queen City Metro buses are a nonpublic forum, we would *still* hold that UFCW has demonstrated a strong likelihood that it will succeed on

13

> the merits of its First Amendment claim. Restrictions on access to a nonpublic forum must be reasonable and viewpoint neutral.
>
> * * *
>
> Where the proffered justification for restricting access to a nonpublic forum is facially legitimate, the government nevertheless violates the First Amendment when its stated purpose in reality conceals a bias against the viewpoint advanced by the excluded speakers….Clearly any effort to suppress the [UFCW] ad due to disagreement with its pro-union message offends the values underlying the First Amendment, for above all else, the First Amendment means that government has no power to restrict expression because of its message or its ideas.

163 F.3d at 355-56 (emphasis added, internal, quotes citations, and brackets omitted).

Significantly, in upholding the preliminary injunction, the *Southwest Ohio* court even assumed that there was no animus against the union—that is was not discrimination it that sense. Rather the transit authority was engaged in viewpoint discrimination by finding the union advertisement to be "controversial" and not "aesthetically pleasing." Even if such a policy were reasonable in nature, the Court found that it was not being reasonably applied because the transit authority had allowed political ads in the past. *Id.* at 357-58. Furthermore courts should give such claims a searching review—and not just for abuse of discretion. *Id.* As the Court in *Southwest* stated:

> [D]eferring to the unproven subjective determinations of state officials absent a clear abuse of discretion would leave First Amendment rights with little protection. An official harboring bias against a particular viewpoint could readily exclude ads communicating that viewpoint simply by "determining" that the ad was controversial, aesthetically unpleasing, or otherwise offensive. We simply will not allow such speculative allegations to justify the exclusion of a speaker from government property.

*Id.*

Here unlike *Southwest,* ITP really does have an animus against Plaintiffs. ITP is at odds with the ATU in collective bargaining, and it resents the message that it is not being fair to

employees. But even if there were no animus—and there is—it is hard to discern any reasonable application of this policy *except* for animus. Gary Peters and Michael Scruggs and Mark Schauer have all had events or made public appearances here, which are necessarily controversial. Nor is the political messaging inconsistent with the use of this property as a bus stop. After all, Plaintiffs are handing out the hand bill *at every other bus stop*. Any legitimate or compelling interest in stopping the leafleting at one bus stop while it is going on at others is hard to comprehend. Accordingly, there is ample reason to believe that Plaintiffs can establish that the action here is (1) viewpoint based, (2) taken out of spite or animus, (3) not inconsistent with the purpose of this area, which is to be the same kind of bus stop that exists all over the metropolitan area.

## Conclusion

For all these reasons, Plaintiffs respectfully request that the Court enter a temporary restraining order enjoining Defendant from prohibiting Plaintiffs and their members and representatives from distributing leaflets and from disciplining Local 836 members for distributing such materials in the outside areas of Rapid Central Station.

Dated: August 25, 2015

Respecfully submitted,

    s/ Sean Morales-Doyle
One of Plaintiffs' Attorneys

Thomas H. Geoghegan
Sean Morales-Doyle
Despres, Schwartz & Geoghegan, Ltd.
77 West Washington Street, Suite 711
Chicago, Illinois 60602
(312) 372-2511